Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | § | |
| UNITED STATES OF AMERICA | § | RELATOR BRENDA SMITH'S FIRST |
| *ex rel.* Brenda Smith, | § | AMENDED COMPLAINT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | 19-cv-02062-BAH |
| | § | |
| KIRA, LLC; KIRA TRAINING SERVICES | § | |
| LLC; CH2MHILL ACADEMY SERVICES; | § | |
| ALEUT FACILITIES SUPPORT | § | JURY TRIAL DEMAND |
| SERVICES, LLC; TLINGIT HAIDA | § | |
| TRIBAL BUSINESS CORP.; PACIFIC | § | |
| ARCHITECTS & ENGINEERS, LLC; and | § | |
| JACOBS ENGINEERING GROUP INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

RELATOR BRENDA SMITH'S AMENDED COMPLAINT

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

TABLE OF CONTENTS

I.      Introduction ................................................................................................................1

II.     PARTIES ...................................................................................................................3

        A.      Relator .............................................................................................................3

        B.      Defendants .......................................................................................................4

III.    SUCCESSOR LIABILITY ........................................................................................6

IV.     VICARIOUS LIABILITY .........................................................................................7

V.      Jurisdiction and Venue ...............................................................................................7

VI.     APPLICABLE LAW (STATUtES & REGULATIONS) ...........................................8

VII.    contracts at issue .....................................................................................................10

VIII.   Air Force Academy's Wastewater Treatment Facility ..............................................11

        A.      Background ....................................................................................................11

        B.      Wastewater Treatment Process .....................................................................11

        C.      NPDES Permit ...............................................................................................17

        D.      Key PWS Requirements ................................................................................22

IX.     DEFENDANTS' FRAUD ON THE GOVERNMENT .............................................24

        A.      Relator's Discovery of Defendants' Fraud....................................................24

        C.      Defendants Have Knowingly & Recklessly Disregarded the NPDES Permit
                Requirements for Treating Wastewater. ........................................................40

        D.      Defendants Submitted or Caused Submission of False Records and Certifications
                ........................................................................................................................41

X.      RETALIATION AGAINST RELATOR ...................................................................42

XI.     DEFENDANTS ViolatED the False Claims Act .....................................................55

        A.      False Claims Act ...........................................................................................55

        B.      Defendants Violated the False Claims Act....................................................57

        1.      Defendants Knowingly and Recklessly Failed to Comply with the Terms of the
                NPDES Permit (Violation of 31 U.S.C. § 3729(a)(1)(A)).............................57

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

2.    Defendants Knowingly and Recklessly Made or Used False Records or

Statements  (Violation of 31 U.S.C. § 3729(a)(1)(B))......................................58

3.    Conspiracy (Violation of 31 U.S.C. § 3729(a)(1)(C)) ........................................58

4.    Reverse False Claims (Violation of 31 U.S.C. § 3729(a)(1)(G))........................59

XII.    CAUSES OF ACTION ................................................................................61

XIII.    INDEX OF EXHIBITS ................................................................................65

IX.    DEMAND FOR JURY TRIAL ............................................................................68

X.    RELIEF ................................................................................................................69

XI.    PRAYER ..............................................................................................................69

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

Plaintiff/Relator Brenda Smith submits this Amended Complaint pursuant to the False Claims Act, 31 U.S.C. §§ 3729–33, and seeks to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States of America and on her own behalf.  Relator would respectfully show the following:

## I.   INTRODUCTION

1.      The United States has trusted its contractors, subcontractors, and their successors-in-interest—Tlingit Haida Tribal Business Corporation, Kira LLC, Kira Training Services LLC, CH2MHill Academy Services, Pacific Architects & Engineers, Jacobs Engineering Group Inc., and Aleut Facilities Support Services, LLC (collectively, "Defendants")—to operate the wastewater treatment facility that services the United States Air Force Academy and the surrounding community.  Defendants are responsible for ensuring that sewage is properly treated and disinfected before being (1) released into Monument Creek, a stream on the Arkansas River water basin and located in El Paso County, Colorado or (2) used to irrigate 650 acres nearby.  In exchange for lucrative contracts with the Government, Defendants promised that they would treat the wastewater until the pollutants in it were within the limits set by the Environmental Protection Agency ("EPA") in the permit for operating the facility.  Instead of operating the facility as required by their contract with the Government and treating the wastewater as required by the facility permit, since at least 2014, Defendants have been releasing partially treated sewage into Monument Creek and the ground surrounding Monument Creek and have intentionally concealed their conduct from the Government.  Defendants' misconduct not only caused substantial harm to the environment as pathogens and contaminants from wastewater polluted waterways, but also caused a serious health hazard.

2.      Relator is an operator at the wastewater treatment plant and has witnessed the

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

Defendants' failure to properly treat sewage.  On numerous occasions, Relator has reported the problems with the treatment plant, but was disregarded and, instead, received threatening emails, was denied promotions, and assigned to less-desirable shifts. See ¶¶ 116-170.

3.      Defendants' fraudulent scheme caused the United States to pay hundreds of millions of dollars that it would not have paid had it known that Defendants were noncompliant with a multitude of material water safety regulations.  Even worse, Defendants' practices put United States Air Force personnel at risk.

4.      Defendants' fraudulent scheme has likely already caused harm. In November 2019, the Air Force Times reported that  "[a]bout 400 cadets at the Air Force Academy – one in every 10 — have been laid low by the norovirus since late October, according to academy officials."[1] Norovirus "[t]ransmission occurs primarily through the fecal–oral route, either through direct person-to-person contact or indirectly via contaminated food or water."[2] Norovirus is "highly contagious," and once an individual is infected, may "also spread through aerosols of vomitus and contaminated environmental surfaces and objects."[3] Defendants' fraudulent scheme, which results in untreated fecal matter being released in to Colorado waterways, likely caused this norovirus outbreak.

5.      Defendants have caused a serious health hazard. Thousands of people have been exposed to harmful and potentially deadly bacteria.  Significantly, the bacteria in human waste, like E. Coli, can cause diseases. Contagious diseases, like norovirus and giardiasis, may also be transmitted by fecal matter.

---

[1]      *Norovirus Outbreak Plagues Air Force Academy*, AIR FORCE TIMES, Nov. 23, 201https://www.airforcetimes.com/news/your-air-force/2019/11/23/norovirus-outbreak-plagues-air-force-academy/.
[2]      *Norovirus,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://wwwnc.cdc.gov/travel/yellowbook/2020/travel-related-infectious-diseases/norovirus (last visited Nov. 16, 2021).
[3] *Id.*

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

6.      Defendants have also caused harm to the environment.  Specifically, harmful solids and chemicals in sewage can damage bodies of water that support wildlife. The fertilizers in untreated wastewater, such as nitrogen and phosphates, encourage algae growth, which blocks sunlight and affects the quality of the water. The bacteria in untreated sewage uses up oxygen in the water as they decompose the organic material in the wastewater, and the resulting lack of oxygen in the water kills the fish. The solids in untreated wastewater cause the water to appear dark and murky, which also affects the ability of fish to breathe and see around them.

7.      Because Defendants failed to adequately treat the wastewater at the Facility, Defendants callously risked the health and safety of United States Air Force personnel, surrounding community members, and the environment.

## II.      PARTIES

### A.      RELATOR

8.      Plaintiff/Relator Brenda Smith is a citizen of the United States and a resident of the State of Colorado. From January 2, 2014 to the present, Relator has worked for Defendants CH2M Hill Academy Services, Kira, LLC, and Pacific Architects and Engineers, LLC ("PAE"), in succession as a contract operator.  Relator was employed by each of these three companies as shown in the following timeline, due to changes in Defendants' contracts and subcontracts to operate the Facility:

Until October 2014: CH2M Hill Academy Services

October 2014 to March 2019: Kira, LLC

March 2019 to present: PAE

9.      As a contract operator, Relator Smith operated and monitored all wastewater treatment processes, as well as collected sewage and wastewater samples to test biochemical,

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

solids and oxygen demands against dissolvability. Relator Smith brought this action based upon her direct, independent, and personal knowledge.

      B.    DEFENDANTS

      10.    Defendant Tlingit Haida Tribal Business Corporation ("Tlingit Haida") is a federally chartered Tribal Business Corporation, pursuant to 25 U.S.C. § 477, wholly owned by the Central Council of the Tlingit and Haida Indian Tribes of Alaska. It is headquartered in Fairfax, Virginia. Tlingit Haida serves as a holding company with more than a dozen subsidiaries that operate as Limited Liability Companies (LLCs) engaged in multiple lines of business. Tlingit Haida owns Defendant Kira, LLC. Defendant Kira Training Services LLC is Tlingit Haida's subsidiary. Tlingit Haida may be served through its registered agent, Metin Zeybel, at 2751 Prosperity Avenue, Suite 315, Fairfax, Virginia 22031-4326.

      11.    Defendant Kira, LLC was a privately held company incorporated in Colorado with its listed headquarters in Boulder. Kira, LLC was a facilities maintenance, engineering, management, and base operations services contractor. Kira, LLC was sold to Defendant Tlingit Haida Tribal Business Corporation in 2016 and is now wholly owned by Tlingit Haida. Kira, LLC was the employer of Relator and all contract operators at the facility at issue until March of 2019, when the United States entered into a new contract with Defendant Kira Training Services LLC. Kira, LLC may be served through its registered agent, Jonathan Russin, at 1000 Potomac Street Northwest, Suite 200, Washington, DC 20007.

      12.    Defendant Kira Training Services LLC ("Kira Training Services") is a tribal LLC with its listed headquarters in Boulder, Colorado. It is an engineering, facilities maintenance, and training services contractor. Kira Training Services is a subsidiary of Defendant Tlingit Haida and may be served through its registered agent, Rhianna Combs, at 1150 Academy Park Loop, Suite

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

230, Colorado Springs, CO 80910.

13.     Defendants Kira, LLC and Kira Training Services LLC will collectively be referred to hereinafter as "Kira."  Kira (and Tlingit Haida as its owner, beginning in 2016) were the subcontractors responsible for operating the wastewater treatment facility at issue from October of 2014 until March of 2019, pursuant to the United States' contract with Defendant Aleut Facilities Support Services, LLC.  In March of 2019, Kira became the contract awardee and Defendant Pacific Architects & Engineers, LLC became the subcontractor.

14.     Defendant CH2M Hill Academy Services, LLC ("CH2M Hill") was a Delaware corporation headquartered in Englewood, Colorado. Defendants Kira and CH2M Hill operated under a joint venture agreement to perform facilities maintenance services for the United States Air Force Academy until October of 2014, when the United States entered into a new contract with Defendant Aleut. The two companies managed such services through a Board of Directors consisting of executives from both Kira and CH2M Hill.  CH2M Hill was the employer of all contract wastewater treatment plant operators, including Relator, at the facility at issue until its contract expired in October of 2014.  CH2M Hill was wholly acquired by Defendant Jacobs Engineering Group Inc. in 2019 and no longer exists as a corporate entity.  It may be served through Jacobs Engineering Group Inc.'s registered agent, CT Corporation System, at 1015 15th Street Northwest, Suite 1000, Washington, DC 20005.

15.     Defendant Aleut Facilities Support Services, LLC ("Aleut") is an Alaska limited liability company headquartered in Colorado Springs, Colorado. It provides operations and maintenance, information technology, and engineering services to a range of Federal agencies. The United States contracted with Aleut and its subcontractors, Defendants Kira and Tlingit Haida, to operate the wastewater treatment facility at issue from October of 2014 until March of 2019.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

Aleut may be served through its registered agent, Corporation Service Company, at 1900 West Littleton Boulevard, Littleton, Colorado 80120.

16.    Defendant Pacific Architects & Engineers, LLC ("PAE") is a Delaware LLC headquartered in Falls Church, Virginia that operates nationwide.  PAE is subcontracted with Kira to operate the wastewater treatment facility at issue, effective March of 2019, pursuant to Kira's contract with the United States.  As a result, PAE is the current employer of Relator and all other contract wastewater treatment plant operators in this matter.  PAE may be served through its registered agent, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

17.    Defendant Jacobs Engineering Group Inc. ("Jacobs") is a Delaware corporation headquartered in Dallas, Texas.  It maintains an office in this District at 601 New Jersey Avenue Northwest, Suite 450.  Jacobs acquired Defendant CH2M Hill in 2017 and became its successor-in-interest.  Jacobs may be served through its registered agent, CT Corporation System, at 1015 15th Street Northwest, Suite 1000, Washington, DC 20005.

18.    Defendants' timeline of involvement with regard to the Facility at issue is:

| From | To | Contractor | Subcontractor | Also Involved |
|------|-----|-----------|---------------|---------------|
| Late 1990s | Oct. 2014 | CH2M Hill and Kira (joint venture) | | Jacobs (as successor to CH2M Hill) |
| Oct. 2014 | Mar. 2019 | Aleut | Kira, LLC | Tlingit Haida (as successor to Kira, LLC) |
| Mar. 2019 | Nov. 30, 2025 | Kira Training Services | PAE | Tlingit Haida (as parent of Kira Training Services) |

### III.    SUCCESSOR LIABILITY

19.    Defendant Tlingit Haida Tribal Business Corporation is the successor-in-interest to Defendant Kira, LLC and has assumed its rights, duties, and liabilities.  Tlingit Haida's purchase

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

of Kira, LLC has resulted in the substantial continuity of Kira, LLC's business.  In addition, Tlingit

Haida maintained Kira, LLC's services over the United States Air Force Academy's wastewater

treatment facility.  As successor-in-interest to Kira, LLC, Tlingit Haida has assumed Kira, LLC's

liabilities with respect to this suit.

20.    Defendant Jacobs is the successor-in-interest to Defendant CH2M Hill and has

assumed its rights, duties, and liabilities.  Jacobs' purchase of CH2M Hill has resulted in the

substantial continuity of CH2M Hill's business.  As successor-in-interest to CH2M Hill, Jacobs

has assumed CH2M Hill's liabilities with respect to this suit.

IV.    VICARIOUS LIABILITY

21.    Any and all acts alleged herein to have been committed by any or all of the

Defendants were committed by said Defendants' officers, directors, employees, representatives,

or agents who at all times acted on behalf of their respective Defendant(s) and within the course

and scope of their employment.

22.    Defendants Tlingit Haida and Kira Training Services are related entities sharing

common employees, offices, and business names such that they are jointly and severally liable

under legal theories of respondeat superior.  The past, present, and continuing relations and

dealings by and between Tlingit Haida and Kira Training Services are so inextricably intertwined

that for purposes of this suit, they should be considered as a single entity at law and at equity.  Kira

Training Services is a mere instrumentality and/or agent of Tlingit Haida.

V.    JURISDICTION AND VENUE

23.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729–33.  This Court

has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 31

U.S.C. §§ 3730 and 3732.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

24.     This Court has personal jurisdiction over Defendants because they transact business within the District of Columbia.

25.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. § 1395, and 31 U.S.C. § 3732(a), because Defendants transact business and have offices within the District of Columbia.

## VI.     APPLICABLE LAW (STATUTES & REGULATIONS)

26.     The Clean Water Act, enacted in 1972, is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of any pollutant into waters of the United States, except in accordance with certain requirements.  Relevant here, Section 402(a) of the Clean Water Act, 33 U.S.C. § 1342(a), allows the Administrator of the United States Environmental Protection Agency (EPA) through the National Pollutant Discharge Elimination System (NPDES) to issue permits that allow wastewater dischargers and treatment facilities to discharge certain amounts of "pollutant" into "navigable waters." 33 U.S.C. § 1362(12).  Specifically, NPDES permits establish specific amount of effluent discharge limits (e.g., E-Coli, ammonia, nitrate, solids, etc.), monitoring and reporting requirements, and may also require these facilities to undertake special measures to protect the environment from harmful pollutants.

27.     Colorado Regulation 100, 5 Colo. Code Regs. §§ 1003-2:100.1 *et seq.*, sets out requirements applicable to wastewater treatment plant operators like Relator and her coworkers at the Facility.  The following subsections of Colorado Regulation 100 are relevant to this matter:

- "100.12.5 Certified operators in responsible charge shall protect the public health and the environment in the conduct of their duties. The certified operators in responsible charge are accountable for the operation and maintenance of the water or wastewater facility and are responsible for understanding the requirements of the applicable permits, laws and regulations. These duties include the following:

  (a) controlling, supervising or actively participating in the planning,

8

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

operation and maintenance of a water or wastewater facility;

(b) making process control and system integrity decisions on the operation and maintenance of the water or wastewater facility;

(c) making decisions and initiating actions regarding the operation of the water or wastewater facility in a timely manner;

(d) inspecting and testing new, modified, or repaired facilities prior to placing or returning such facilities into service;

(e) developing maintenance programs;

(f) developing and maintaining the written operating plan as described in section 100.12.6;

(g) reporting instances of non-compliance or situations that could result in non-compliance as appropriate to facility owners and the Department; and

(h) performing other functions of direct responsibility, including those enumerated in section 100.11." 5 Colo. Code Regs. § 1003-2:100.12.5 (2020); *see also* 5 Colo. Code Regs. § 1003-2:100.16.3 (2012)

- "100.11.2 Certified operators shall protect the public health and the environment by properly performing and/or supervising the activities pertinent to controlling the operation of a water or wastewater facility in accordance with a written operating plan as described in section 100.12.6 as appropriate to their level of certification, including but not limited to the following:

    (a) controlling the selection of or flow from a source to a water or wastewater facility and controlling the selection of or flow from a water or wastewater facility to a receiving body or system;

    (b) controlling the processing of raw and/or treated and/or finished water/wastewater;

    (c) preparing and/or controlling chemical addition for water or wastewater treatment;

    (d) observing and taking necessary actions in response to variations in operating conditions;

    (e) interpreting meter and/or gauge readings and adjusting facility processes based on such interpretations;

    (f) controlling the operation and maintenance of valves and/or gates;

    (g) controlling the operation and maintenance of pumps;

    (h) maintaining logs and/or records;

    (i) collecting and/or analyzing process control samples; and

    (j) reporting instances of non-compliance or situations that could result in non-compliance to the certified operator in responsible charge." 5 Colo. Code Regs. § 1003-2:100.11.2 (2019); *see also* 5 Colo. Code Regs. § 1003-2:100.15.4 (2012).

- "When acting in the capacity of a certified operator, certified operators shall refrain from behaving in a threatening, intimidating, demeaning or similar manner in verbal or written communications or in interactions with the public, the regulated community and regulators." 5 Colo. Code Regs. § 1003-2:100.11.3 (2019).

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

- "No owner of a water or wastewater facility shall allow the facility to be operated without the direct supervision of one or more certified operators in responsible charge. 'Direct supervision' means that the certified operators in responsible charge have supervisory responsibility and authority with respect to the operation of the water or wastewater facility and for the activities and functions of other facility operators." 5 Colo. Code Regs. § 1003-2:100.10.1(a) (2019); *see also* 5 Colo. Code Regs. § 1003-2:100.18.1 (2012).

## VII.   CONTRACTS AT ISSUE

28.    The United States first contracted its wastewater treatment facility (hereinafter, the "Facility") operations at the Air Force Academy to Defendants CH2M Hill and Kira, LLC (as a joint venture) in the late 1990s, under multiple contracts.  As a result, until October of 2014, Relator and all contract Facility operators were employed by and received their W-2 forms from CH2M Hill.

29.    The United States awarded Defendant Aleut a $95,986,770 five-year firm-fixed-price contract for civil engineering support services at the Air Force Academy beginning in October of 2014.  Aleut subcontracted approximately 47% of the work under this contract—including all Facility operations—to Defendant Kira, LLC.  Kira, LLC's primary responsibility was to ensure that the Air Force Academy complies with its NPDES permit.  To this end, Kira, LLC employed Relator and all contract Facility operators from October of 2014 until the contract ended in March of 2019.

30.    The United States entered into a $221 million contract with Defendant Kira Training Services LLC[4] in late 2018 to continue the services that Kira provided as subcontractor to Aleut, but this time as the prime contractor.  The contract took effect in March of 2019 and expires on November 30, 2025.  Defendant PAE became the subcontractor with regard to the Facility.  Relator and all contract operators became employees of PAE and remain so to this day.

---

[4] Contract No. FA7000-19-C-0001

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

31.     Defendants' performance under their contracts with the United States must comply with the Facility's NPDES permit and Performance Work Statement ("PWS").  The relevant requirements of those two documents are explained further in Section VIII(C) and VIII(D) *infra*.

VIII.   AIR FORCE ACADEMY'S WASTEWATER TREATMENT FACILITY

A.      BACKGROUND

32.     The United States Air Force Academy ("the Academy") is the Air Force's military service academy, equivalent to the Army's military academy at West Point and the Navy's Naval Academy at Annapolis.  Most of the Academy is located west of Interstate-25 in Colorado, extending into the edge of the Rocky Mountain foothills.

33.     In 1958, the United States Government built the Air Force Academy Wastewater Treatment Facility.  The Facility purifies wastewater for a population of approximately 16,800 people, including cadets, students, housing units for cadet military personnel, and millions of visitors from all over the world, and workers that do not live at the Academy, including those in local schools, hospitals, child care facilities, and a fire station.

B.      WASTEWATER TREATMENT PROCESS

34.     The Facility's wastewater treatment process involves several steps (IMAGE 1), including (1) Collection, (2) Preliminary Treatment (Screening), (3) Primary Treatment (Primary Clarifier), (4) Secondary Treatment (Oxidation Ditch), (5) Secondary Treatment (Secondary Clarifier), (6) Filtration, (7) Disinfection, and (8) Distribution. Each of these steps is discussed in detail below.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions



**IMAGE 1: Wastewater Treatment Process**

35.    <u>Collection (Influent)</u>:  The wastewater treated by the Facility is collected from the Academy and the surrounding community.  This raw wastewater is called "influent" and transported to the Facility using a series of pumps and pipelines.  At the Facility, large pumps are used to transfer the raw wastewater up into the Facility, which is engineered to utilize gravity water flow as much as possible to reduce pumping costs.

36.    <u>Preliminary Treatment (Bar and Grit Screens)</u>: Influent contains varying amounts of suspended and dissolved materials, human waste, urine, including turbidity, color, taste, odor, pathogenic microorganisms, medical waste, trash, and chemicals. The material varies in size from microscopic to whatever can be flushed down a toilet. Accordingly, the first process in the Facility is screening and grit removal. This process occurs at the point where the wastewater enters the Facility and strains out larger items, using a large metal screen called a bar screen. Large items are trapped on the screen as the wastewater passes through it.



Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

**IMAGE 2: Bar and Grit Screens[5]**

The bar screen is automatically raked and cleaned to prevent disruption of the treatment process.

The wastewater than enters a centrifugal grit separator or "grit screen" and any remaining solids

are pumped into the next phase of the process.

37.   <u>Primary Treatment (Primary Clarifier)</u>:  After preliminary treatment the wastewater

is introduced into an anoxic ditch.  This part of the treatment process involves the physical removal

of solids from the wastewater by gravity, which provides some degree of purification. A layer of

accumulated solids, called sludge, forms at the bottom of the tank and is periodically removed.

Since this is the first phase of clarification the tank is often called a "primary clarifier."



**IMAGE 3: Primary Clarifier**

The Facility has one primary clarifier. The settled solids are called sludge.  The sludge is then

pumped to an anaerobic (without oxygen) digester for further treatment while the remaining

wastewater is transferred to the next phase of treatment.

---

[5] Images 2 through 5 are demonstrative and not actual schematics or pictures of the Facility.  An overhead map of the facility, showing the locations of many of these processes, can be found in Exhibit 1 at 31 (PERMIT RENEWAL APPLICATION PAGE 31).

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

38.    Secondary Treatment (Oxidation Ditch):  Oxidation ditches are a type of biological treatment process which remove additional solids from wastewater through oxidation.  Oxidation ditches typically consist of an oval shaped channel configuration (IMAGE 4).  The Facility has two Oxidation Ditches, which operate alternatively.



**IMAGE 4: Oxidation Ditch**

39.    Once wastewater is inside the oxidation ditch it is aerated at a rate which fosters microbial (bacteria) growth.  The circulation rate also ensures that the microorganisms and wastewater come into contact so that the microorganisms can digest and break down solids in the wastewater.  This process lasts twenty-five (25) days. The long retention time helps more solid materials to break down and to be removed from the wastewater.  After oxidation treatment, the wastewater is gravity-fed to the next part of the process.

40.    Secondary Treatment (Secondary Clarifier):  The secondary clarifier operates much like the primary clarifier.  It allows the sludge and the wastewater to further separate before the wastewater is sent to filtration, the next step in the process.

41.    Filtration:  After the wastewater is clarified, gravity feeds it into a filtration system. The Facility has three filters.  The filters use sand, removing not only particulate matter, but also organic compounds that can cause odor problems.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

42.    <u>Disinfection</u>: After wastewater is filtered, it enters the Facility's ultraviolet (UV) disinfection system.  At the heart of the UV system are numerous high-performance mercury-vapor lamps, which are rated at 300 watts and covered with a hard quartz tube. Each lamp has an operational life of 4000 hours. There are twelve lamps in the UV system. Two chamber banks of UV lamps able to handle a flow of 1.0 GMD each (if higher flows occur, after four minutes both UV systems will come on). Each chamber bank holds six lamps. The chamber banks are installed in parallel chambers that are switched weekly. The goal of disinfection is to reduce the risk of human exposure to pathogenic microorganisms.



**IMAGE 5: Ultra-Violet Disinfection**

43.    Traditionally, chlorine gas was the most common method of wastewater disinfection. Chlorine is relatively inexpensive, but it is a highly toxic chemical that must be transported and handled with extreme caution. Accordingly, for the past few decades, many wastewater treatment facilities have switched from chlorine disinfection to ultra-violet disinfection.  The Facility switched to UV disinfection in 2005.

44.    UV disinfection is costlier than chlorine disinfection due to the price of the lamps

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

used.  However, UV disinfection does not produce harmful byproducts, and is not toxic to the environment.  UV technology protects against pathogenic microorganisms, including protozoa, bacteria, and viruses. Chemical disinfection using chlorine is also effective against these pathogens; however, there are pathogens, such as Cryptosporidium and Giardia, which are chlorine-resistant but can be disinfected by UV light.  It is for these reasons that Defendants chose to use the UV disinfection process.

45.    <u>Distribution</u>:  Before disinfected wastewater can be released from the Facility into Monument Creek or for site irrigation, the NPDES permit requires the Facility operator to test the discharge effluent levels of the wastewater.  To do this, the Facility's operators must collect a sample from the "Sample Point" (IMAGE 6).  Other required testing is sampled at other points[6] (i.e., influent is sampled after passing through the bar and grit screens).



**IMAGE 6: Facility Sample Point**

46.    The testing must be conducted according to test procedures approved under 40 CFR Part 136 ("Guidelines Establishing Test Procedures for the Analysis of Pollutants").  At the end of

---

[6] There are approved points but the Facility at issue, as explained further *infra*, often uses unapproved sample points.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

each month, effluent test results are reported to the Air Force Academy on Form 1462 (Exhibit 4). The Academy then reports the test results on a Discharge Monitoring Report Form ("DMR") (EPA No. 3320-1), which is submitted to the State of Colorado and the EPA. If there is a violation of the NPDES permit's maximum effluent discharge limitations, the Facility is required to report the violation within twenty-four (24) hours to the EPA and WQD.

47. The Facility has two discharge points, Outfall 001A (Monument Creek) and Outfall 001B (which leads to Non-Potable Reservoir #1, used for irrigation).

C. NPDES PERMIT

48. During the time period relevant to this action, the Academy has held two NPDES permits, one effective in 2011 and one effective in 2015 (attached, with fact sheet, as Exhibits 1, 2, and 3). The permits allow the Facility to discharge treated wastewater: (1) from the Facility into Monument Creek, a stream on the Arkansas River water basin located in El Paso County, Colorado or (2) to non-potable reservoirs for re-use for irrigation. The Facility's NPDES permit number is CO-0020974.

49. The Facility's 2015 NPDES permit expired on December 31, 2019. The Facility applied for a permit renewal on June 18, 2019. Ex. 1, New Permit Application. To Relator's knowledge, the Facility continues to operate under an extension of the 2015 permit, pending issuance of a new one.

50. The Facility's NPDES permits were issued to the United States Air Force Academy by the Colorado Department of Public Health & Environment's Water Quality Control Division ("WQD"), to which the EPA has delegated authority to administer the Clean Water Act in the State of Colorado. Compliance monitoring under the NPDES Program takes place largely at the state

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

level through WQD, and also through the EPA's Region 8 office in Denver.[7]

51.     The Facility's current NPDES permit places limitations on its effluent discharge;
these are the same discharge levels that have been in place since the Facility received its 2006
NPDES permit:

| Effluent Characteristic | Effluent Limitation | | |
|---|---|---|---|
| | 30-Day Average a/ | 7-Day Average a/ | Daily Maximum a/ |
| Flow, MGD | 1.4 | N/A | N/A |
| Carbonaceous Biochemical Oxygen Demand (CBOD₅), mg/L (Kg/day) b/ | 25 (132) | 40 (212) | N/A |
| Total Suspended Solids , mg/L (Kg/day) b/ | 30 (159) | 45 (238) | N/A |
| Total Residual Chlorine, ug/L c/ | 11 c/ | N/A | 19 c/ |
| E. coli, no./100 mL | 126 | 252 | N/A |
| Total Ammonia as N, mg/L | | | |
| January | 5.1 | N/A | 13 |
| February | 4.7 | N/A | 11 |
| March | 3.2 | N/A | 7.3 |
| April | 1.9 | N/A | 6.1 |
| May | 2.4 | N/A | 7.9 |
| June | 3.0 | N/A | 10 |
| July | 2.3 | N/A | 9.7 |
| August | 1.9 | N/A | 7.9 |
| September | 2.3 | N/A | 8.7 |
| October | 3.4 | N/A | 11 |
| November | 3.7 | N/A | 11 |
| December | 3.7 | N/A | 8.9 |
| The pH of the discharge shall not be less than 6.5 or greater than 9.0 at any time. | | | |
| There shall be no chronic toxicity at an instream waste concentration (IWC) of 100 percent of the final effluent from Outfall 001B. | | | |
| The concentration of oil and grease in any single sample shall not exceed 10 mg/L nor shall there be any visible sheen in the receiving water. | | | |

---

[7] The Region 8 office covers Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming.  EPA, *EPA Region 8 (Mountains and Plains)*, https://www.epa.gov/aboutepa/epa-region-8-mountains-and-plains

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

52.     Monument Creek is considered "navigable water" and/or "water of the United States" for purposes of the Clean Water Act.  *See* 33 U.S.C. § 1362(7).  The NPDES permit requires that any "grit, solids, sludge, or other pollutants removed in the course of treatment" be "buried or disposed in a manner consistent with all applicable federal and state regulations . . . and in a manner *so as to prevent any pollutant from entering any waters of the United States or creating a health hazard.*"  Ex. 2, at 17 (emphasis added).  The permit prohibits sludge, digester supernatant, and filter backwash from being directly blended with or entering "either the final plant discharge and/or waters of the United States."  *Id.*  Both Monument Creek and the non-potable reservoirs to which the Facility discharges are "waters of the United States" under the Facility's permit fact sheet.  *See* Ex. 1, at 3.

53.     Here are the key NPDES permit (Ex. 2) sections (sections 1.2, 1.3, 2.1, 2.4, 2.5, 2.6, 2.7, 2.8, 2.9, 3.1, 3.4, 3.5, 3.6, 3.7, 4.7.4, and 4.8):

- "The authorization to discharge provided under this permit is limited to those outfalls specifically designated below as discharge locations. Discharges at any location not authorized under an NPDES permit is a violation of the Clean Water Act and could subject the person(s) responsible for such discharge to penalties under Section 309 of the Act. (listing two discharge points: (1) to Monument Creek (Outfall 001A) and (2) to non-potable reservoir no. 1 on Lehman Run (Outfall oo1B)). § 1.2
- "Effective immediately and lasting through the life of this permit, there shall be no discharge from Outfall 001A except when it is impracticable to discharge to Non-Potable Reservoir No. 1. Ehen discharged from Outfall 001A, the quality of effluent discharged by the facility shall, except as noted, at a minimum, meet the imitations set for below…" (listing limits on emission amount and content); § 1.3
- "Representative Sampling. Samples taken in compliance with the monitoring requirements established under Part 1 shall be collected from the effluent stream prior to discharge into the receiving waters. Samples and measurements shall be representative of the volume and nature of the monitored discharge. Sludge samples shall be collective as a location representative of the quality of sludge immediately prior to use-disposal practice." § 2.1
- Additional Monitoring by the Permittee. If the permittee monitors any pollutant more frequently than required by this permit, using test procedures approved under 40 CFR 136, 40 CFR 503, or as specified in this permit ,the results of this monitoring shall be included in the calculation and reporting of the data submitted

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

in the DMR. Such increased frequency shall also be indicated." § 2.5

- <u>Records Contents</u>. Records of monitoring information shall include:

    2.6.1. The date, exact place, and time of sampling or measurements;

    2.6.2. The initials or name(s) of the individual(s) who performed the sampling or measurements;

    2.6.3. The date(s) analyses were performed;

    2.6.4. The time(s) analyses were initiated;

    2.6.5. The initials or name(s) of individual(s) who performed the analyses;

    2.6.6. References and written procedures, when available, for the analytical techniques or methods used; and,

    2.6.7. The results of such analyses, including the bench sheets, instrument readouts, computer disks or tapes, etc., used to determine these results." § 2.6

- Retention of Records. The permittee shall retain records of all monitoring information, including all calibration and maintenance records and all original strip chart recordings for continuous monitoring instrumentation, copies of all reports required by this permit, and records of all data used to complete the application for this permit, for a period of at least three years from the date of the sample, measurement, report or application. Records of monitoring required by this permit related to sludge use and disposal activities must be kept at least five years (or longer as required by 40 CFR 503). This period may be extended by request of the Director at any time. Data collected on site, data used to prepare the DMR, copies of Discharge Monitoring Reports, and a copy of this NPDES permit must be maintained on site. § 2.7

- <u>Twenty-four Hour Notice of Noncompliance Reporting</u>. The permittee shall report any noncompliance which may endanger health or the environments soon as possible, but no later than twenty-four (24) hours from the time the permittee first became aware of the circumstances. § 2.8.

- <u>Other Noncompliance Reporting.</u> Instances of noncompliance not required to be reported within 24 hours shall be reported at the time that monitoring reports for Part 2.4 are submitted. § 2.9,

- <u>Duty to Comply</u>. The permittee must comply with all conditions of this permit. Any failure to comply with the permit may constitute a violation of the Clean Water Act and may be grounds for enforcement action, including, but not limited to permit termination, revocation and reissuance, modification, or denial of a permit renewal application. The permittee shall give the director advance notice of any  planned changes at the permitted facility that will change any discharge from the facility, or of any activity that may result in failure to comply with permit conditions. § 3.1.

- <u>Duty to Mitigate.</u> The permittee shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment. § 3.4.

- Proper Operation and Maintenance. The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

with the conditions of this permit. Proper operation and maintenance also includes adequate laboratory controls and appropriate quality assurance procedures. This provision requires the operation of back-up or auxiliary facilities or similar systems which are installed by a permittee only when the operation is necessary to achieve compliance with the conditions of the permit. However, the permittee shall operate, at a minimum, one complete set of each main line unit treatment process whether or not this process is needed to achieve permit effluent compliance. § 3.5.

- <u>Removed Substances</u>. Collected screenings, grit, solids, sludge, or other pollutants removed in the course of treatment shall be buried or disposed in a manner consistent with all applicable federal and state regulations (i.e., 40 CFR 257, 40 CFR 258, 40 CFR 503) and in a manner so as to prevent any pollutant from entering any waters of the United States or creating a health hazard. **In addition, the use and/or disposal of sewage sludge shall be done under the authorization of an NPDES permit issued for the use and/or disposal of sewage sludge by the appropriate NPDES permitting authority for sewage sludge.** Sludge/digester supernatant and filter backwash shall not be directly blended with or enter either the final plant discharge and/or waters of the United States. § 3.6 (bolding in original).

- <u>Bypass of Treatment Facilities</u>.
  <u>Bypass not exceeding limitations</u>. The permittee may allow any bypass to occur which does not cause effluent limitations to be exceeded, but only if it also is for essential maintenance to assure efficient operation. These bypasses are not subject to the provisions of Parts 3.7.2 and 3.7.3.
  3.7.2. <u>Notice</u>:
    3.7.2.1. <u>Anticipated bypass</u>. If the permittee knows in advance of the need for a bypass, it shall submit prior notice, if possible at least 10 days before the date of the bypass to the USEPA, Technical Enforcement Program, and the State of Colorado. Unanticipated bypass. The permittee shall submit notice of an unanticipated bypass as required under Part 2.8, Twenty-four Hour Noncompliance Reporting, to the USEPA, Technical Enforcement Program, and the State of Colorado.
    3.7.3. <u>Prohibition of bypass</u>.
    3.7.3.1. Bypass is prohibited and the Director may take enforcement action against a permittee for a bypass, unless:
        3.7.3.1.1. The bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;
        3.7.3.1.2. There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgement to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance; and,
        3.7.3.1.3. The permittee submitted notices as required under Part 3.7.2.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

3.7.3.2. The Director may approve an anticipated bypass, after considering its adverse effects, if the Director determines that it will meet the three conditions listed above in Part 3.7.3.1. § 3.7.

- **Certification**. Any person signing a document under this section shall make the following certification:

  "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations." § 4.7.4.

- <u>Penalties for Falsification of Reports</u>. The Act provides that any person who knowingly makes any false statement, representation, or certification in any record or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or non compliance shall, upon conviction be punished by a fine of not more than $10,000 per violation, or by imprisonment for not more than six months per violation, or by both. § 4.8.

D.    <u>Key PWS Requirements</u>

54.    In addition to the NPDES permit, the Facility must comply with the terms of its Performance Work Statement ("PWS"), which sets out the terms of Defendants' performance of their contract with the United States.  *See* Ex. 6, SMITH0006886, at 4, 6.  The PWS's "desired outcomes" include, in relevant part, "[n]o environmental violations or regulatory actions" against the Facility, and "24/7 Uninterrupted [Facility] operations in compliance with all applicable permits and environmental laws." Ex. 6, at 4–5.

55.    The PWS also requires the following, in relevant part:

- Facility staff must be "trained, qualified, certified, and licensed, to meet local, state, [Air Force], DoD, and Federal requirements." Ex. 6, , at 6.

- Defendants must "be knowledgeable of and comply with all applicable federal, state, county, DoD, [Air Force], and [Air Force Academy] regulations, instructions, and requirements for successful execution of th[e] contract." Ex. 6, at 9.

22

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

- Defendants "shall ensure policies and procedures are established that protect the health and safety of employees and the community." *Id.*

- The Facility must generally be kept clean and orderly. *See* Ex. 6, at 12.

- Defendants must monitor and record the Facility's effluent (discharged water) "on a daily basis, recording and differentiating flows" to the two discharge points. Ex. 6, at 25.

- Defendants must "manage, execute, and provide oversight to ensure compliance is effectively and efficiently executed . . . [in accordance with] all federal, state, and local laws statutes and regulations including [] Executive Orders, [and] DoD/[Air Force]/[Air Force Academy] policies and requirements." Ex. 6, at 30.

- Facility personnel must be trained in a proper and timely manner in accordance with "all applicable legal, regulatory, and compliance requirements. All [Facility] personnel shall know the environmental requirements that apply to their daily duties and receive the commensurate level of environmental education and training for those duties." *Id.*

- Personnel shall not "perform any activities and/or tasks at the [Facility] without proper and adequate qualifications or job competency training." Ex. 6, at 31.

- Defendants "shall complete [NPDES] permit discharge monitoring reports" and "maintain the compliance status" of the Facility's permits. Ex. 6, at 32.

- Defendants shall prepare reports in accordance with "NPDES and equivalent requirements." *Id.* Any plans and permits required by law must be prepared and maintained. *See id.*

- Defendants must "[c]onduct inspections needed to maintain compliance with plans, permits, and regulations." *Id.*

- Defendants must ensure that pollutants are prevented from entering storm water systems. Ex. 6, at 33.

- Defendants must "[d]evelop and maintain the necessary corrective actions to ensure compliance with permits[,]" notify the Air Force Academy immediately about "any conditions that may cause permit violations[,]" and "[c]orrect all non-compliance items within permit timelines." *Id.*

- Spills must be prevented and reported in accordance with a spill prevention control and countermeasures plan. Ex. 6, at 35.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

- Defendants must perform preventative maintenance on the facility to prevent deterioration beyond normal wear and tear.  Ex. 6, at 38.  This includes maintaining electrical systems.  *See* Ex. 6, at 45.

- Defendants must operate, inspect, test, maintain, and repair the Facility.  Ex. 6, at 46. This includes providing "all chemicals needed to operate" the Facility and other system/s.  Ex. 6, PWS, at 47.

- Facility operators must hold a Colorado level "C" wastewater license and lead operators shall hold a "B" level license.  Ex. 6, at 81.

## IX.   DEFENDANTS' FRAUD ON THE GOVERNMENT

A.   RELATOR'S DISCOVERY OF DEFENDANTS' FRAUD

56.     Relator has worked in the wastewater treatment industry for over twenty-three years and holds the highest operator certification in the State of Colorado.  As a result, Relator has long been knowledgeable about the rules, requirements, and technical procedures for treating the wastewater processed at the Facility.

57.     Relator began working for Defendant CH2M Hill as a contract Wastewater Treatment Operator ("operator") on January 2, 2014.  As previously noted, she was later employed by Defendants Kira, LLC and PAE.

58.     As an operator, Relator is responsible for operating and monitoring all wastewater treatment processes; inspecting and maintaining the wastewater treatment plant, equipment and systems; making adjustments to equipment in maximizing efficiency and compliances with all regulatory guidelines and policy.  Relator also collects test samples to account for effluent levels in the treated sewage and manages the records of all operations, specimen testing, chart readings, and results to track progress and report key findings.

59.     Shortly after she began working at the Facility, Relator noticed issues with its treatment process and laboratory procedures as she conducted her daily rounds as an operator. Despite Relator reporting these violations to Defendants and trying to stop near-daily violations of

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

the NPDES permit, PWS, and federal regulations, Defendants refused to bring the Facility into compliance and made false representations to the United States.

60.     Each major category of noncompliance with the NPDES permit or PWS which resulted in fraud on the United States is described below.

B.     MAJOR CATEGORIES OF NONCOMPLIANCE

61.     The categories of violations of the permit include:

- Solids and sludge carrying through the process, in violation of Permit § 3.6;

- Using glycol for nitrate control, which causes plant "upset" and exceeds permit limitations, and failing to report such use, in violation of Permit §§ 2.8, 3.6

- Deliberate manipulation of UV Power Level to manipulate E. Coli test results, and destruction of tests with undesirable results, in violation of Permit §§ 1.3, 2;

- Laboratory Misconduct included unserviced and unworking equipment, falsifying test results and not performing required tests, sample shopping, and widespread issues with lack of calibration, in violation of Permit §§ 1.3, 2, 3.5;

- Falsification of records, including failure to report use of chlorine as well as false reporting to hide improper procedures, in violation of Permit §§ 1.3, 2, 4.8; *see* Ex. 7, SMITH0003548 (showing shows false reporting of minimum and maximum flow in order to hide improper backwashing/bypass that violated Section 3.7 of the Permit);

- Insufficient UV disinfection in violation of Permit §§ 2.5, 3.5;

- Use of chlorine in violation of Permit §§ 1.3.1, 1.3.2.1;

- Use of drying beds with cracks which permit sludge to leach into the groundwater, and overflow into Monument Creek during rain, in violation of Permit §§ 2.1, 3.5,

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

3.6; (*see also* Ex. 8, SMITH0005289 (July 12, 2020), portraying the cracked drying
bed);

- Inappropriately use of potable water lines to dilute wastewater and to "flush out"
  wastewater despite the lack of backflow protection in violation of Permit § 3.6; and

- Unreported bypasses in violation of Permit §§ 2.8, 2.9, 3.6, 3.7;

- Other miscellaneous violations, including maintenance-related violations (Permit §
  3.5).

62.     Every permit violation is a violation of EPA laws/regulations and a material breach
of Defendants' contracts with the Air Force.

1. GLYCOL AND METHANOL

63.     The influent wastewater entraining into the Facility contained large amounts of
food-grade propylene glycol, which is used in heating and air conditioning systems.  Additionally,
the glycol impeded the oxidation process, when later cycling through the system, because the
bacteria would eat the glycol rather than the solids in the sewage.  Because solids were not being
filtered out properly, high levels of solid-filled sewage would continue through the process.  The
secondary clarifiers, the filters, and UV systems would be overwhelmed and unable to properly
clean and disinfect the sewage, because they are not designed to handle the high level of solids
caused by the influx of glycol.  Notably, large amounts of sludge can harbor and shield pathogens
from the UV light and prevent disinfection.

64.     From June 22 to June 23, 2018, for example, a glycol spill resulted in high turbidity
(exceeding the NPDES permit limitations) and low UV effectiveness.  The incident was never
reported.

65.     The Facility typically uses methanol for nitrate control.  Methanol is expensive, so

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

in order to cut costs, the Facility (1) used too little methanol; (2) failed to keep methanol in stock; and (3) used propylene glycol deliberately, in an unapproved fashion, for nitrate control.

66.     Deliberate propylene glycol introduction for nitrate control resulted in plant "upsets" – episodes of imbalance which can take days or weeks to recover from and which cause insufficient treatment of wastewater.  Virtually none of these incidents were reported, and neither was the Facility's deliberate use of propylene glycol for nitrate control.

67.     To give just one example of many, on November 15, 2017, Operator Matt Cafiso deliberately added propylene glycol for nitrate control "in place of methanol." (IMAGE 7).

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions



**IMAGE 7**
**Deliberate Glycol Introduction for Nitrate Control**

68.     Defendants failed to adequately maintain methanol supplies in violation of the

PWS.  This resulted in plant upset or NPDES permit limitations being exceeded.  Those incidents

were never reported, however.

69.     For example, between April 11 through April 16, 2020, the Facility's effluent

exceeded limits for turbidity and nitrates due to the plant running out of methanol supplies.  The

28

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

water was discharged to non-potable reservoirs for irrigation regardless, without being reported to the Air Force Academy or EPA.

70.    The glycol and methanol issues above violated the PWS and Sections 1.3, 2.8, and 3.6 of the Facility's NPDES permit.

2.    SOLIDS AND SLUDGE VIOLATIONS

71.    Further, the primary clarifier pumps, which move sludge out of the sewage, are not maintained.  Defendants' failure to conduct proper maintenance on the primary clarifier pumps means that large amounts of solids are being allowed to move through the treatment process and, like the glycol, disrupt the proper operation of the sewage treatment.  The primary clarifier also leaches sewage into the ground because of numerous micro cracks that have never been repaired. *See* Ex. 9, SMITH00002410 (June 23, 2019, video taken by Relator showing persistent maintenance issue with leaching wastewater through a crack in the primary clarifier).

72.    The conduct above violated, at a minimum, the PWS and Section 3.6 of the Facility's NPDES permit.

3.    POWER OUTAGES, ILLEGAL BYPASSES, AND IMPROPER BACKWASHING

73.    The treatment process has also been disrupted on numerous occasions because of periodic power outages at the plant.  As with the other disruptions, the power outages cause the systems to stop operating properly, even though wastewater is still flowing into the Facility for treatment.  Solids, thus, are not properly removed and the treatment process does not clean and disinfect the wastewater.

74.    In short, the power outages cause a "bypass," meaning that the wastewater bypasses steps of the wastewater treatment process and insufficiently-treated wastewater is discharged into the Facility's effluent.  Bypasses also resulted at times of heavy water influx.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

75.     Defendants also deliberately bypassed on a weekly basis when performing "backwashing." Backwashing removes accumulated solids and other material from the Facility's effluent filters (like spraying a hose at a dirty air filter). Because filter backwash contains solids and other contaminants, it cannot be processed by the UV disinfection system (the next step of the process), so it should be pumped back into the Facility for reprocessing. The Facility's Standard Operating Procedure ("SOP"), however, directed operators to "flush" effluent filters by pumping water through at a high volume and passing solids into the UV disinfection system and effluent. This results in violation of the limitations set forth in the NPDES permit (including bacteria and E. Coli limitations) and the permit's direct prohibition on discharging filter backwash. The Facility's backwashing SOP could be completed more quickly than the proper method—but at the cost of illegally discharging insufficiently-treated wastewater. The Facility never reported these "backwashes" as required by Section 3.7 of the NPDES permit.

76.     The conduct above violated, at a minimum, the PWS and Sections 2.8, 2.9, 3.6, and 3.7 of the Facility's NPDES permit.

### 4. UV DISINFECTION VIOLATIONS

77.     Significantly, Defendants have for at least the past seven (7) years failed to operate and/or properly maintain the Facility's UV disinfection system. Defendants, at times, do not even use the UV System. Other times, the lamps in the UV System do not work because they are old and need to be replaced. Because of the expense, Defendants do not replace the lamps. All of these issues with the UV system have led to the discharge of wastewater that underwent ineffective or no disinfection. Similarly, Defendants often run the UV System on Power Level No. 1, rather than Power Level No. 3 in order to extend the life of UV lamps and save money, even though the EPA put Defendants on notice that Power Level No. 1 is not effective for treating wastewater

30

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

effectively.  Specifically, during an August 2, 2016, EPA inspection of the facilities, Defendants

misrepresented to the EPA that the UV lights are run at Power Level No. 3 at all times. Ex. 10,

SMITH0001879, at 1-2. The findings of the inspection resulted in a corrective action requiring

that Power Level no. 3 be used at all times. Ex. 11, SMITH0002084.

78.     However,  the picture below shows that on July 29, 2017, after the inspection and

corrective action requirement, the UV lamps were set to Power Level No. 1:



Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

Ex. 12, SMITH0005376.

79.     Defendants took other shortcuts to reduce expenses associated with the UV lights, including not changing bulbs as frequently as required, replacing broken bulbs with used bulbs, or replacing some bulbs but not others (the manufacturer's instructions state that bulbs should be replaced all at once, together, or effectiveness may be impacted). Ex. 13, SMITH0005374 (July 30, 2017, chart of maintenance performed on UV bulbs).

80.     Insufficient power levels combined with flawed maintenances leads to insufficient disinfection and permit violations, violating, at a minimum, the PWS and Sections 2.5 and 3.5 of the Facility's NPDES permit.

### 5.   LABORATORY AND SAMPLING MISCONDUCT

81.     Any time a wastewater sample is tested and E-Coli levels are shown to be above the levels allowed in the NPDES permit, Defendants destroy the sample and reschedule the test to be reported to the EPA for another day.  This process repeats until a sample tested has the discharge effluent levels allowed by the permit.

82.     Defendants deviate from the Facility's approved sampling points for wastewater, as shown in the graphic below.  The red dots indicate unapproved sampling points used by Defendants in order to take improper samples that will yield a more compliant test result and disguise Defendants' fraudulent scheme.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions



**IMAGE 8**
**Sampling Points**



**IMAGE 9**
**Primary Clarifier Sampling Points**

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions



**IMAGE 10**
**Headworks Sampling Points**



**IMAGE 11**
**More Sampling Points**

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions



**IMAGE 12**
**Oxidation Ditch Sampling Points**

83.     For example, the ammonia test solution is often watered down to save money. This has been occurring since 2014. See Ex. 14, SMITH0005075; Ex. 15, SMITH0005086; Ex. 16 SMITH0005113.

84.     Additionally, lab equipment should be calibrated weekly, but, under instructions from Gerald Williams, the lab equipment is calibrated monthly, not weekly. Operators are further instructed not to use the properly-calibrated lab equipment used by the lab technician, but rather to use the improperly calibrated equipment. At one point, Jack Damien wrote Mike Wamsley up for using the Lab tech equipment.

85.     E-Coli samples were not incubated for twenty-four hours, yielding inaccurate results. See Ex. 17, SMITH0003479 (showing log of E-Coli sample).

35

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

86.   The conduct above violated, at a minimum, the PWS and Sections 1.3, 2.1, 2.4, 2.5, 2.6, 2.7, 2.8, 2.9, and 3.5 of the Facility's NPDES permit.

6.   UNREPORTED MISUSE OF CHLORINE

87.   Because the plant uses UV disinfection, any use of chlorine must be reported. But Defendants routinely use chlorine "pucks" to keep within permit limits for E-Coli, etc. and to clean effluent filters and do not report this on required forms (as shown in prior slide).

88.   Relator's photographs show continued use of chlorine pucks, and positive chlorine tests she conducted, but submitted DMRs do not report or test for chlorine. Relator has also been instructed to use chlorine brickets (a compressed 'brick' of chlorine dust, similar to what is used in residential pools) to chlorinate the filters. *See* Ex. 18, SMITH0003268 (Jan. 31, 2014, instructions to operators).

89.   The conduct above violated, at a minimum, the PWS and Sections 1.3.1 and 1.3.2.1 of the Facility's NPDES permit.

7.   SLUDGE DRYING BED VIOLATIONS

90.   Sludge from the wastewater treatment process is dried out in concrete drying beds before transport to McDonald Farms as fertilizer.  Defendants routinely left sludge piled so high that it spilled out of the drying beds and entered Monument Creek or other nearby bodies of water when rain fell.  Defendants also failed to maintain the drying beds, so that sludge seeped through cracks in the cement into Monument Creek, the soil, or other nearby bodies of water.

91.   An EPA inspection in 2017 observed overloading of the drying beds.  Defendant Aleut later reported to the EPA that the practice had stopped, but it has continued periodically up to the present day.  The cracks in the drying beds were never repaired.

92.   The conduct above violated the PWS and Sections 2.1, 3.5, and 3.6 of the NPDES

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

permit.

8. <u>MISUSE OF POTABLE WATER LINES</u>

93.     Defendants misused the Facility's potable water lines, in violation of the PWS and Section 3.6 of the Facility's NPDES permit.

94.     First, Defendants used potable fire hydrant lines (and later installed a direct hook-up to potable water lines inside the Facility's filter house) in order to "backwash" effluent filters or water/chemical lines around the Facility.  Due to the potable line's lack of an adequate backflow prevention device for most of the period at issue, this could result in contamination of potable water with wastewater.  It is especially concerning that the filter backwash contained elevated levels of solids that could harbor E. Coli and other pathogens.

95.     This happened on October 2, 2015, June 28, 2018, and many other occasions, and the Relator reported it to Defendants' management.

96.     Second, Defendants periodically used potable water to dilute wastewater in order to yield more compliant test results, disguising the Facility's incomplete treatment of wastewater. For example, this was performed on April 14, 2020, and is plainly shown in the Facility's influent chart for that day (IMAGE 12).

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions



**IMAGE 13**
**Dilution of Wastewater with Potable Water**

97.     Relator also observed this practice, or evidence that it had occurred, on April 9, 2020 and April 16, 2020.

98.     Defendants never reported their misuse of potable water lines to the EPA or Air Force.

### 9. MAINTENANCE FAILURES

99.     Defendants failed to properly maintain the Facility as required by the PWS and by Sections 3.4 and 3.5 of the NPDES permit.   For example, at times the pump was defective and leaking due to poor maintenance. Ex. 19, SMITH0006084. At another point, there was a persistent **nine-year leak** into the electrical box. Ex. 20, SMITH0005815; Ex. 21, SMITH0005989. At other times the sand filter malfunctioned due to poor maintenance. Ex. 22, SMITH0004808; Ex. 23, SMITH0004768. There was a persistent leak in the effluent gate. Ex. 24, SMITH0003758; Ex. 25,

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

SMITH0003766. There was poor maintenance of the septic filter well. Ex. 26, SMITH0002032. There were regularly leaks of between 40,000 and 100,000 gallons due to poor maintenance. Ex. 27, SMITH0003189; Ex. 28, SMITH0003168; Ex. 29, SMITH0003174; Ex. 30, SMITH0003182; Ex. 31, SMITH0001672; Ex. 32, SMITH0003185; Ex. 33, SMITH0003184; Ex. 34, SMITH0003172; Ex. 35, SMITH0003178; Ex. 36, SMITH0003175; Ex. 37, SMITH0003177. Water deionization (DI) units for the lab were not kept in working order, leading to false lab test results. Ex. 38, SMITH0004441.

10. MISCELLANEOUS VIOLATIONS

100.     The following violated miscellaneous sections of the Facility's NPDES permit and PWS, including but not limited to Sections 1.3, 3.4, 3.5, and 3.6 of the NPDES permit.

101.     At times, the "mag tank" was "watered down," by introducing water. Magnesium Hydroxide (MgOH) is used for alkalinity and pH control at the plant.  It must be kept within a certain range for the good microorganisms to thrive and reproduce and treat the water properly.  If there is too much or too little, then bad microorganisms will increase in numbers and cause a "plant upset", where the plant will be unable to process wastewater correctly and there will be discharge permit violations.  Some plant upsets can be recovered from in hours or days.  However, in other cases, recovery is not possible; new "good" microorganisms must be brought in from another plant and the recovery will take 2-3 months.  When the MgOH tank overflows, it goes out into the plant which can cause plant upset. *See* SNITH0002263.

102.     Other things led to plant upsets as well, which result in NPDES permit violations and exceeding effluent limits.  For example, at times high nitrates were present, in violation of the permit, causing plant upset. Ex. 39, SMITH00002925. At other times, insufficient amounts of methane was used for nitrate control, resulting in plant upset and subsequent permit violations. *See*

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

Ex. 40, SMITH0006049. None of these upsets were reported, resulting in submission of false records to the EPA and violation of the PWS and permit.

### 11. DEFENDANTS' CONCEALMENT OF VIOLATIONS

103.    Relator has repeatedly voiced her concerns with the treatment process and the high levels of E-Coli to management, but Defendants' management has disregarded her concerns. *See* Section X *infra*. Defendants have, in fact, made concerted efforts to conceal the Facility's defective treatment process. *See, e.g.,* Exhibit 5.

104.    Also, as noted, Defendants are required by the NPDES permit to self-report any event in the Facility that causes non-compliance (often within twenty-four (24) hours of the occurrence). *See* Ex. 2 at 14–15. However, Defendants have intentionally failed to inform the EPA about non-compliance.

### C.    DEFENDANTS HAVE KNOWINGLY & RECKLESSLY DISREGARDED THE NPDES PERMIT REQUIREMENTS FOR TREATING WASTEWATER.

105.    From at least 2014 until the present, Defendants have failed to comply with the requirements in the NPDES permit. Defendants have knowingly and recklessly allowed the sewage treatment process to be disrupted and discharged effluent with levels, particularly of E-Coli, well above that allowed in the NPDES permit into navigable waters—Monument Creek or for irrigation. Defendants also have intentionally failed to inform the EPA—as required by Sections 2.8 and 3.1 of the NPDES permit and the PWS—about repeat events that have caused the Facility to be non-compliant. *See* Ex. 2, at 14–15; Ex. 6, PWS, at 33.

106.    A failure in any of the wastewater treatment steps can result in inadequate treatment of wastewater and possible NPDES permit violations. But here, Defendants' mismanagement of the Facility caused daily insufficiencies in multiple steps of the process. It is likely that wastewater was insufficiently treated on a near-daily basis during the time period at issue.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

107.     Defendants have caused a serious health hazard.  Thousands of people have been exposed to harmful and potentially deadly bacteria.  Significantly, the bacteria in human waste, like E. Coli, can cause diseases.

108.     Defendants have also caused harm to the environment.  Specifically, harmful solids and chemicals in sewage can damage bodies of water that support wildlife. The fertilizers in untreated wastewater, such as nitrogen and phosphates, encourage algae growth, which blocks sunlight and affects the quality of the water. The bacteria in untreated sewage uses up oxygen in the water as they decompose the organic material in the wastewater, and the resulting lack of oxygen in the water kills the fish. The solids in untreated wastewater cause the water to appear dark and murky, which also affects the ability of fish to breathe and see.

D.     DEFENDANTS SUBMITTED OR CAUSED SUBMISSION OF FALSE RECORDS AND CERTIFICATIONS

109.     Defendants routinely failed to report discharges to Monument Creek, glycol spills, and use of chlorine on Form 1462 or otherwise (among other failures).  The Air Force used Form 1462 to complete Discharge Monitoring Reports ("DMRs") submitted to the EPA and certified their accuracy.

110.     To provide an example, the October 31, 2016, DMR is false because it says there was no discharge to Monument Creek during that period. (Ex. 41, SMITH0007199 at 1)*; contrast with* Exx.. 42, SMITH0003776;Ex. 43,  SMITH0003780.

111.     Defendants also kept false laboratory and testing records and tampered with test results, as noted *supra*, which led to false DMRs.

112.     Defendants routinely failed to maintain a water retention pond at the Facility and monitor its levels.  The pond was used for overflow during unexpected events like heavy rainfall, because the Facility could not treat all incoming water adequately.  When the pond filled, overflow

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

entered Monument Creek.   The pond was also unlined and cracked, so incompletely-treated wastewater also leached out of it into Monument Creek on a routine basis.   The Facility was required to report all of these incidents as discharges to Monument Creek on Form 1462 (which the Air Force Academy would submit to the EPA) but failed to do so, causing the submission of false DMRs and false certifications in them.

113.    Defendants failed to prevent or report other discharges to Monument Creek that occurred due to poor maintenance, including, for example, an instance when, on October 31, 2016, a leak in the old chlorine contact chamber necessitated a discharge to Monument Creek—a discharge that was never reported. Ex. 44, SMITH0006282; Ex. 45, SMITH0006283.

114.    Defendants also caused false NPDES permit applications and re-applications to be submitted.  For example, the Facility's NPDES permit re-application of June 18, 2019 falsely states that the Facility discharges to Monument Creek less than one month of the year (in reality, that happens much more frequently and is unreported).   It also falsely states that there is no land application, no flow over 120 gallons per person, and deliberate glycol use for nitrate control is not discussed.  The record of flows provided on page 68 is also false.

115.    The conduct noted above, at a minimum, violates the Facility's PWS and Sections 1.3, 2.4, 2.8, 2.9, 3.7, and 4.7.4 of the Facility's NPDES permit.

## X.    RETALIATION AGAINST RELATOR

116.    Defendants Kira, LLC ("Kira"), CH2M Hill Academy Services ("CH2M Hill"), and Pacific Architects & Engineers, LLC ("PAE")[8] retaliated against Relator in response to her reports of and efforts to stop Defendants' fraud against the United States.

---

[8] Including Defendants Jacobs and Tlingit Haida, as successors-in-interest to Defendants CH2M Hill and Kira, LLC.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

117.    Relator began her employment with Defendant CH2M Hill on January 2, 2014, as a contract operator.  Relator operated and monitored all wastewater treatment processes, as well as collected sewage and wastewater samples to test biochemical, solids and oxygen demands against dissolvability.

118.    Almost immediately, Relator noticed that the Facility was not following the requirements of its NPDES permit and federal wastewater regulations.  The violations were so frequent and serious that they amounted to fraud on the United States.  Even during her initial training by then-chief operator Gerald Williams ("Williams"), Relator raised her concerns.  Early in 2014, Gerald Williams began calling Relator during her work shift to harass and threaten her in retaliation for trying to stop fraud on the United States.  For example, during one call, Williams told Relator "stop doing it" with regard to reporting violations at the plant to him, and threatened her, "what makes you think you [aren't] working for the devil himself."  Williams' calls continued into 2015.

119.    Relator nonetheless continued to report permit violations to Williams.  On May 1, 2014, Relator informed Williams that spilled digester sludge must be reported to the United States and that soil samples must be taken to assess contamination.  Williams responded that digester sludge spills could simply be cleaned up without further reporting or testing.  This is at odds with the Facility's NPDES permit and PWS.  *See* Ex. 2, at 16–17; Ex. 6, PWS, at 33.

120.    In October of 2014, due to the Facility's contractor change, Relator's employer became Defendant Kira.  Her supervisors and other aspects of her employment remained the same.

121.    In late 2014, Kira Quality and Safety Manager Ray Rivera spoke to Relator onsite about her reports of permit violations.  Rivera told Relator that her reports could "ruin" Kira and the Air Force Academy.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

122.   On March 15, 2015, Relator reported to Robert Fant of the Air Force that the Facility was "sample shopping"—manipulating testing in order to stay within permit limits—a clear fraud on the United States in violation of laws and the Facility's permit.

123.   Despite Williams' harassment, Utilities Supervisor Anthony "Jack" Damien ("Damien") initially viewed Relator's performance positively.  On March 17, 2014, Damien told Relator that he was considering promoting her into Williams' position.  And, on July 15, 2014 Damien passed along praise and thanked Relator for giving a well-conducted tour of the Facility to students at Colorado Technical University.  Damien also gave Relator multiple letters of recommendation for training programs she wished to attend.  As time went on, however, Relator's increasing reports of regulatory violations and fraud on the United States changed her superiors' attitude towards her, and their retaliation increased.

124.   In June and July of 2015, Relator e-mailed Damien and Williams to report that 28 cubic yards of untreated septic bio-solids were swept into Monument Creek, in violation of the plant's permit.  Relator followed up by e-mailing Damien and Williams detailed accounts of ongoing permit and legal violations, including unreported discharges of untreated wastewater to Monument Creek, unreported and improper chlorine usage, "staging" lab tests, and improper backwashing.  Relator did not receive a response.

125.   On September 16, 2015, Relator e-mailed Mark Bartle ("Bartle"), KIRA's Chief Operating Officer, to report misuse of potable water lines at the Facility.  Relator reported that use of potable water lines to "flush out" clogged wastewater lines risked contaminating potable water, due to the lack of a backflow preventer.  Relator suggested installing a backflow prevention device or using a "jet truck" instead.  Ex. 46, SMITH0002584.  Bartle dismissed Relator's concerns, responding on September 22 that "there is no danger." *Id*.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

126.    Frustrated with the lack of response to and dismissal of her reports, Relator told Damien in November of 2015 that she had never seen a more unethical group of operators than those at the Facility.  Damien joked in response, "I thought only one was unethical."  Relator understood this to refer to herself. Damien then agreed to give Relator a letter of recommendation for a wastewater training course.

127.    Relator corresponded and spoke with Kira Human Resources in February of 2016 regarding her training, stating that she had been required to spend her own money and use unpaid sick/vacation time for this education.  Kira HR responded that it would only reimburse annual training for licenses required by the contract.  However, Relator learned subsequently that other operators were paid for time off for training.

128.    On February 29, 2016, Relator transmitted a binder of her photographs of permit violations at the Facility to Kira Maintenance Operations Manager Matthew Gogan ("Gogan").  The binder cataloged every category of permit and regulatory violations Relator witnessed, including those directly resulting in false claims or records.  Relator also reported to Gogan that the Facility had no written Standard Operating Procedures ("SOPs") as required by regulation, and that unreported discharges into Monument Creek were criminal offenses.

129.    On March 10, 2016, Danny Follett ("Follett"), an employee in Kira's environmental department, met with Relator at Gogan's request.  Relator showed Follett in person at the Facility where and how permit violations occurred.  She never received a response or any follow-up communications in response.

130.    Relator learned from fellow operator Matthew Cafiso ("Cafiso") on March 15, 2016 that Air Force and Aleut managers came to the Facility that day and spoke to Cafiso, contract operator Brian Drury, and contract operator Joe James regarding permit violations.  Relator learned

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

from Cafiso that James and Drury called the permit "subjective" and stated that Relator did not understand it.

131.   On March 21, 2016, Relator reviewed the binder given to Gogan with his supervisor at Kira, Tom Hayden.  She never received any follow-up communications.

132.   On March 22, 2016, Bartle visited Relator at the Facility, together with a Kira manager from Fort Carson and Kenneth Nachbar of Aleut.  Relator showed the three men charts that backed up her reports of permit violations and fraud.  That same day, Relator received two calls from Kira's founder and owner Carlos Garcia ("Garcia").  Relator reported to Garcia that she had proof of ongoing permit violations at the Facility, that Williams was acting unstable, and that she feared retaliation from Williams.

133.   Later that day, Relator re-sent several prior e-mails reporting violations to Bartle, stating "no one ever got back to me on anything."  Ex. 47, SMITH0003720.  Bartle responded, "Aleut and Kira have started working the process."  *Id*.

134.   On March 23, 2016, Relator e-mailed Bartle again to report permit violations, including sludge drying bed overflow, digester stand pipe spills, and glycol issues.  Ex. 48, SMITH0002429; Ex. 49, SMITH0003642.  Bartle confirmed receipt on March 31, 2016, and reported passing on the information to Aleut management.

135.   That same day, Gerald Williams was laid off temporarily without pay.  Brian Drury ("Drury") became the lead operator and Relator's supervisor.  Drury called Relator and reported that she was being assigned to the "first shift" (8 A.M. to 4 P.M.), allegedly "for her safety."  On March 24, 2016, Relator reported Drury's actions to Bartle as retaliation.

136.   Later on March 24, 2016, Relator re-sent additional reports of permit violations to Bartle, as she never received a response previously.  Ex. 50, SMITH0003511.  Bartle thanked her

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

for the e-mails and responded than an investigation was ongoing.  *Id*.  Relator never received any

further response.

137.    On April 4, 2016, Relator spoke to Alex Richardson of the Air Force and Tamara

Solari of the Environmental Protection Agency ("EPA") via telephone.  Relator reported persistent

"sample shopping," unreported digester sludge spills, unreported discharges to Monument Creek,

sludge drying bed overflow into Monument Creek, unreported bypasses, and unreported chlorine

use in violation of the Facility's permit.  She followed up by sending a flash drive and e-mails

containing photo and video evidence of these violations.

138.    On May 13, 2016, Kira changed Relator's shift hours.  This forced Relator to use

vacation time to meet her required hours for the week.  She was reassigned to perform maintenance

duties (despite no background or training in maintenance) and given an undesirable shift time—

what other operators referred to as the "bastard shift."  Maintenance duties were paid at a lower

rate than Relator's contract operator work, resulting in lower wages for Relator.

139.    Also in May of 2016, Relator sent another flash drive to Bartle containing new

photos and videos of Facility permit violations.  She also reported to Bartle that Joe James lacked

the "Level C" wastewater treatment operator license required by both the PWS and State of

Colorado.  Relator also informed her Union via telephone, after hearing that they might become

involved, that her reports related to federal violations and did not require Union involvement.  On

May 16, 2016, Relator was called to a meeting with Bartle, Damien, KIRA HR Representative

Katie Sakaguchi ("Sakaguchi"), and a representative from her Union.  Relator discussed how only

she was required to perform maintenance, and was falsely told that other operators would rotate

through those duties.  Damien and Sakaguchi denied that Relator's pay had been reduced as a

result.  Bartle also informed Relator that the Facility had reported past violations to the EPA.  In

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

truth, this was only done selectively (if at all).  Relator questioned why the Facility had permitted

Williams to continue his employment, given his misbehavior and violation of the permit and PWS.

Relator stated that Williams had committed violations of the law by doing so.  Bartle and Damien

responded by demanding proof (despite the fact that Relator had already provided ample

documentation).  Bartle, Damien, and Sakaguchi framed the issue as a personal conflict between

Relator and Williams, rather than harassment and retaliation.  Relator expressed disappointment

that the Facility's reaction to her reports of fraud was more concerned with keeping violations

concealed than with fully investigating.  The Facility admitted that there were problems, but

misrepresented to Relator that they were taking steps to bring the Facility into compliance. Ex. __

at 11 ("We're making good faith effort to try and turn around the processes that are here and make

this right") *and* at 20 ("We're just trying to make the appropriate changes, and unfortunately,

there's a lot to be done"). Despite these representations, nothing changed.

140.    On May 4, 2016, Relator reported to Alex Richardson ("Richardson") of the Air

Force that the Facility was reporting extremely low levels of cholorination. Ex. 51,

SMITH0002416.

141.    On May 20, 2016, Relator reported additional retaliation to Bartle and Richardson.

Ex. 52, SMITH0002575 at 3; Ex. 53, SMITH0002902.  She reported being "locked out of

overtime," and losing shift pay. After Relator pointed out that she was the only operator put on a

"rotating schedule," Defendants adjusted the rotating schedule to apply to all operators.

SMITH0002575 at 1. That same day, Relator sent the Facility's scheduling calendar to Sakaguchi

to explain how her shift assignments were shorter and less preferable than those of her peers, in

order to back up her complaints of retaliation.  Ex. 54,  Smith0000115, at 2.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

142.    On May 22, 2016, Relator was visited during her shift at the Facility by two Union representatives.  The representatives told Relator that she would be terminated for harassment of Williams if she did not stop reporting fraud to him, because her reports were not true.  Relator responded that Kira and the Air Force's investigation was ongoing and that she did not want the Union involved, because it was not an employment issue.  She also informed the representatives that Williams had prior documented instances of bad behavior and suggested that they review Williams' record.  Relator was called a "troublemaker" and shouted at in response.

143.    On May 23, 2016, Sakaguchi e-mailed Relator.  Sakaguchi wrote that Relator was placed on a rotating schedule like all other operators, ignoring the fact that Relator had fewer hours and lower pay than her fellow operators.

144.    That same day, Kira Quality and Safety Manager Ray Rivera visited Relator at the Facility.  Relator reiterated the accuracy of her fraud reports and complained that Damien was not protecting her from harassment by Williams and others.  Rivera informed Relator that she was protected "under the federal whistleblowers' act" and stated that Kira could lose its contract due to the issues Relator reported.

145.    On August 1, 2016, Relator conducted a chlorine test of the Facility's effluent, and discovered that chlorine use was still occurring  without being reported, in violation of the law and the Facility's permit.  She reported the issue to Drury.

146.    On August 4, 2016, Relator received a telephone call from Damien, Gogan, and a Union representative.  She was told that she would be terminated if she continued reporting ongoing permit and PWS violations.  Relator explained that investigations were still ongoing.  She also specifically described why the unreported chlorine use, for example, was a violation of the Facility's discharge permit.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

147.    On August 5, 2016, Relator gave Gogan a binder of key federal and state regulations governing the Facility, and another flash drive containing photos and videos of the ongoing violations she witnessed.  She reviewed each item with Gogan and explained the permit violations, including unreported chlorine use.

148.    On August 19, 2016, Drury posted a note saying that all chlorine at the Facility was locked up and only James and Drury had access.

149.    On August 27, 2016, Relator e-mailed Richardson a copy of a third-party audit report of the Facility's laboratory by Dr. Sidney Innerebner.  The audit report described numerous deficiencies that resulted in false laboratory results being reported to the United States.

150.    On March 27, 2017, Relator met with Sakaguchi to discuss the Facility's non-compliance with its discharge permit and PWS and retaliation against her.   Ex. 55, SMITH0007219.   Relator framed those concerns as violations of the law.  *See id.*  Sakaguchi dismissed the concern, telling Relator, "we've addressed those issues and have put processes in place and . . . [w]e're trying to move forward from that."  *Id*. at 1.  Relator described retaliation against her to Sakaguchi, including the following incidents and issues:

- James and Drury told Relator to "shut [her] mouth" when she inquired whether certain laws applied to the Facility (*Id*. at 2);

- Drury attacked Relator by saying she involved herself in issues that were "none of [her] business." (*Id*. at 2);

- "If you don't go along with their lies and if you don't do it the way they want to, they're going to bully you."  (*Id*. at 3);

- Williams' harassing phone calls to Relator (*Id*. at 4);

- James intentionally left heavy hoses in distant places before Relator's shift, forcing Relator to carry them back to where they belonged. (*Id*. at 5);

- "[B]ecause I said something, I've been bullied." (*Id*. at 5);

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

- Certain operators refused to talk to Relator or pass communications onto her, interfering with her ability to do her job. (*Id*. at 6);

- "They're mad at me now because I told the truth." (*Id*. at 7);

Relator expressed frustration that the status quo of fraud continued, stating that the other operators "have their own habits of doing things[,] whether or not it's against the law, as far as water treatment [and the] Clean Water Act [go]." Ex. _, at 2.

151.    In early 2017, Relator refused to sign the Facility's Standard Operating Procedure ("SOP") for backwashing, because it violated the Facility's discharge permit.  The SOP directed operators to "flush" effluent filters by pumping water through at a high volume.  As explained previously, doing this causes large solids to pass through the Facility, all the way into the UV disinfection system, which cannot disinfect solids that large.   This results in discharge of improperly-treated, insufficiently-disinfected effluent, in violation of the limitations set forth in the Facility's discharge permit (including bacteria and E. Coli limitations).  Instead of following this SOP, Relator properly directed the "backwash" into the Facility in stages to be re-processed completely, so that it was not full of solids by the time it reached the UV disinfection stage. Relator's backwashing process took a long time to complete, whereas the Facility's backwashing SOP could be completed more quickly—at the cost of illegally discharging insufficiently-treated wastewater.  As noted previously, the Facility never reported these "backwashes" as required by Section 3.7 of the NPDES permit.

152.    On April 8, 2017, Bartle, Union representative Ron Lenz, and Aleut Utilities and Plant Support Manager Jim Grant ("Grant") met with Relator to discuss her refusal to sign the backwashing SOP. Ex. 56, SMITH0007188, at 1.  Bartle opined that the Facility's backwashing SOP was simply different from Relator's preference, and claimed that the Facility was fully

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

compliant due to prior EPA inspections (which never specifically examined the backwashing procedure). *Id.* at 2. Grant stated that Relator would be given a "write up" for refusing to sign the backwashing SOP. *Id.* at 2. Relator asked, "You're wanting me to sign . . . [a] State and Federal Violation[?]" and Grant responded, "Yes, that's what I want you to sign." *Id.* When Relator again stated that the SOP was "a violation of the EPA Clean Water Act" and the Facility's discharge permit, Grant responded "that's your opinion." *Id.* at 3. Relator explained in detail how the Facility's backwashing SOP constituted a violation of the discharge permit. *Id.* at 4–5. She also explained how to identify improper backwashes by looking at the Facility's effluent charts. *See Id.* at 6.

153.    On June 2, 2017, Grant, Bartle, and Union representative Brian Sicer met with Relator. *See* Ex. 57, SMITH0007214, at 1. Bartle stated that the Facility hired a third-party company (Hydrolysis) to review the backwashing SOP, which reportedly found no issues. *See Id.*, at 1, 3. Bartle asked Relator to sign the SOP, and when she said that she would think about it over the weekend, she was given a formal disciplinary action letter for "insubordination." *Id.*, at 1.

154.    On August 16, 2017, Relator discussed with Drury how the other operators were not taking required laboratory samples on Thursdays. Drury responded that doing so was his choice as the lead operator.

155.    On September 10, 2017, Relator requested a two-day sick leave over two months in advance. Jim Grant later denied her request.

156.    On October 20, 2017, Bartle e-mailed Relator, questioning why she followed her own (proper) backwashing procedure instead of the Facility's flawed SOP. Other operators had previously performed backwashes in this way without being disciplined. Relator responded on

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

October 26, 2017, that the SOP was outdated, vague, and not feasible, and volunteered to help

update it.  Ex. 58, SMITH0002456 at 1.

157.    On November 8, 2017, Relator e-mailed Grant to report ongoing maintenance and

other issues that resulted in PWS or permit violations, including the Facility's improper

backwashing procedure.

158.    Around November 13, 2017, Relator reported denial of her September 10 sick leave

request to Grant.

159.    On November 15, 2017, Relator was issued a "final written warning" for not

following the Facility's flawed backwashing SOP.  Ex. 59, SMITH0003266, at 1.  The letter

claimed that the SOP was "up to date, legal, and appropriate" per an unspecified third-party audit.

*Id*.  Per Relator, the Facility's backwashing procedure was "staged" for the third-party auditor in

order to falsely appear compliant.

160.    On November 28, 2017, Grant and Union representative Brian Sicarillo called

Relator into a meeting.  Ex. 60, SMITH0006825.  Sakaguchi attended the meeting via telephone.

*Id.* at 1. Grant read Relator's November 15 warning letter to her.  *Id.* at 2. Relator reiterated how

she had already explained the problems with the backwashing SOP.  *Id*. She also pointed out that

other operators were not backwashing according to the SOP, and stated, "I'm trying to go by your

procedures, but then also abide by the EPA [regulations] and your discharge permit."  *Id.* at 3.

Grant reiterated the results of the staged third-party audit that found the SOP compliant.  *Id.* Relator

reported to Grant that she was being held to a standard that no other operators were.  *Id.* She went

on to discuss again how the Facility's backwashing SOP violates the discharge permit and how

she had explained that multiple times before.  *Id.* at 4-5. After the meeting concluded, Relator took

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

Brian Sicarillo on a tour of the Facility and explained the ongoing violations and retaliation against her.

161.    On December 1, 2017, Relator inquired with Kira HR about what she should do to report harassment.  She followed up on January 19, 2018, sending a list of backwashes done by others in the same way she did, in order to show that she was not the only one reportedly going against the Facility's improper backwashing SOP.  Kira HR reported on February 22, 2018 that appropriate reprimands were issued.

162.    On April 16, 2018, Relator found a rope tied like a hangman's noose in her work area, and reported it to Kira HR.  Kira HR responded on April 18, 2018 that it was a "common knot" and was not left with any intention for anyone.  Relator forwarded this communication to the Air Force on September 20, 2018.

163.    On August 22, 2018, Relator reported a broken effluent filter washer to Kira management.

164.    On January 18, 2019, Relator reported "floating sludge" in effluent filter #1 to Grant.  This sludge would almost certainly have caused a permit violation because the UV disinfection system cannot process large amounts of sludge which make it that far into the wastewater treatment process.

165.    In March of 2019, Defendant PAE became Relator's employer.  Her supervisors and other aspects of her employment remained the same.  Unfortunately, the retaliation against Relator continued as well.

166.    In the Fall of 2019, James worked the shift immediately prior to Relator's.  James began deliberately leaving lights turned off at the end of his shift in order to harass Relator.  Relator's shift began after dark (at midnight), so this practice presented a safety hazard due to low

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

visibility and presence of dangerous wild animals in the area (*e.g.*, snakes, bears, mountain lions, and coyotes).

167.   Relator reported James' harassing conduct to Grant on September 10, 2019 in a formal written statement.   James' harassment continued, and Relator reported it again on September 17 and 21.   On September 24, 2019, Relator was interviewed by Ellen Hill of PAE Human Resources to investigate "creating a hostile and toxic workplace[.]"   Ex. 61, SMITH0001701 at 1.   It appeared that the investigation stemmed from a complaint by James.

168.   On October 15, 2019, Relator was formally disciplined for "inability or unwillingness to work harmoniously with others" and violating the "harassment-free workplace policy" with regard to James.   *See id.*   The report falsely accused Relator of calling James "psycho" during her interview by Ellen Hill.

169.   To this day, Relator continues to work for Defendant PAE.   Afraid of further retaliation or termination, she has ceased reporting violations to management and ceased reporting misconduct and harassment by her peers.

170.   Defendants PAE, Kira, and CH2M Hill retaliated against Relator with harassment and discipline in response to her reports of and efforts to stop False Claims Act violations.

## XI.   DEFENDANTS VIOLATED THE FALSE CLAIMS ACT

A.   FALSE CLAIMS ACT

171.   This is an action to recover damages and civil penalties on behalf of the Government and Relator arising from false and/or fraudulent statements, claims, and acts by Defendants in violation of the False Claims Act, 31 U.S.C. §§ 3729–32.

172.   The FCA provides that any person who:

> (A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

(B)     knowingly makes, uses, or causes to be made or used, a false record
or statement material to a false or fraudulent claim; [or]

(C)     conspires to commit a violation of [one of the above],

\*   \*   \*

(G)     knowingly makes, uses, or causes to be made or used, a false record
or statement material to an obligation to pay or transmit money or
property to the Government, or knowingly conceals or knowingly
and improperly avoids or decreases an obligation to pay or transmit
money or property to the Government,

31 U.S.C. § 3729(a)(1), is liable to the Government for a civil penalty of not less than $11,665 and

not more than $23,331 for each such claim, plus three times the amount of damages sustained by

the Government because of the false or fraudulent claim.  31 U.S.C. § 3729(a); 28 C.F.R § 85.5.

173.   The FCA defines "claim" as:

(A)     [] any request or demand, whether under a contract or otherwise, for money
or property and whether or not the United States has title to the money or
property, that—
    (i)     is presented to an officer, employee, or agent of the United States;
        or
    (ii)    is made to a contractor, grantee, or other recipient, if the money or
            property is to be spent or used on the Government's behalf or to
            advance a Government program or interest, and if the United States
            Government—
        (I)     provides or has provided any portion of the money or
                property requested or demanded; or
        (II)    will reimburse such contractor, grantee, or other recipient for
                any portion of the      money or property which is requested
                or demanded. . . .

31 U.S.C. §3729(b)(2).

174.   The FCA allows any persons having knowledge of a false and/or fraudulent claim

against the United States to bring an action in federal district court for themselves and for the

United States, and to share in any recovery as authorized by 31 U.S.C. § 3730. The FCA also

protects whistleblowers who have suffered retaliation because of their efforts to stop one or more

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

violations of the False Claims Act. *See* 31 U.S.C. § 3730(h).

B.     DEFENDANTS VIOLATED THE FALSE CLAIMS ACT

> 1.     Defendants Knowingly and Recklessly Failed to Comply with the Terms
> of the NPDES Permit (Violation of 31 U.S.C. § 3729(a)(1)(A)).

175.     From at least 2012 to the present, Defendants have knowingly presented and/or caused to be presented false and/or fraudulent claims for payment or approval to the United States Government.   As a condition of entering into a contract with the Government to operate the Facility, Defendants agreed to comply with the Clean Water Act, the Act's implementation regulations, and the NPDES permit, including, but not limited, to the requirement that the discharge contain only certain amounts of pollutants and that any event that causes the Facility to be noncompliant be reported to the EPA.

176.     Each time Defendants submitted reports to the Government regarding the Facility's wastewater treatment process, Defendants certified that they not only complied with NPDES Permit discharge effluent levels, but also that they would report any occurrence of noncompliance. These representations were false.   Defendants knowingly made numerous express false certifications of compliance with regulations and contract terms because Defendants complied with neither the regulations nor the contracts.   Likewise, Defendants knowingly made numerous implied false certifications of compliance when they discharged effluent into Monument Creek or for irrigation, even though the effluent only was partially treated. Every time Defendants submitted claims for payments and/or reimbursement under the various contracts, those claims were false for lack of compliance.

177.     If the Government had known that the Facility was not complying with the terms of the NPDES permit and was only partially treating the sewage, the Government would not have paid Defendants for operating the Facility.   By concealing their noncompliance, Defendants

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

deprived the Government of its contractual and regulatory right to require Defendants to take

corrective action or to terminate its contract with Defendants.

> 2.   Defendants Knowingly and Recklessly Made or Used False Records or
>       Statements  (Violation of 31 U.S.C. § 3729(a)(1)(B)).

178.   From at least 2012 to the present, Defendants knowingly made and/or used, or

caused to be made and/or used, false records or statements material to false and/or fraudulent

claims paid or approved by the United States.

179.   Defendants' contracts and the NPDES permit require Defendants every month to

submit their effluent test results to the Air Force Academy on Form 1462.  The results are then

submitted to the State of Colorado and the EPA on the Discharge Monitoring Report Form

("DMR") (EPA No. 3320-1).

180.   If there is a violation of the NPDES permit's maximum effluent discharge

limitations, the Facility is required to report the violation within twenty-four (24) hours to the EPA

and WQD.  Since at least 2012, Defendants have every month caused submission of Form 1462s

which falsely represent that their discharge effluent levels are compliant with the NPDES permit.

This caused the Air Force to submit false DMRs to the EPA, which also contained false

certifications of accuracy and compliance.

181.   Defendants also caused the Air Force Academy to submit false NPDES permit

applications and renewal applications.

182.   If the United States had known that the Facility's discharge effluent levels routinely

were not within the limits allowed by the NPDES permit, and that other key submissions were

falsified, the United States would not have paid Defendants.

> 3.   Conspiracy (Violation of 31 U.S.C. § 3729(a)(1)(C))

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

183.    By planning and implementing their schemes, Defendants violated 31 U.S.C. § 3729(a)(1)(C).  Defendants conspired together to cause the submission of false and/or fraudulent claims, make or cause false records, and falsely represent their compliance with applicable laws and regulations, the Facility's NPDES permit, and the PWS.

184.    Until their contract ended in October of 2014, Defendants CH2M Hill and Kira, LLC, by working together as a joint venture, conspired to violate the FCA when they managed the Facility.

185.    Defendants Aleut, Tlingit Haida, and Kira, LLC conspired together to violate the FCA during their tenure as contractors and subcontractors responsible for managing the Facility. This is clear from internal investigative documents bearing Aleut's logo and Relator's interactions with personnel from all three companies.

186.    Similarly, Defendants Kira Training Services and PAE have conspired together since March of 2019 to violate the FCA.

187.    Defendants conspired to falsely certify the truth and accuracy of records submitted to the United States, including Discharge Monitoring Reports, AF-1462 forms, and NPDES permit renewal applications.  Defendants also conspired to falsely certify compliance with laws and regulations under the contracts and PWS at issue.

188.    All Defendants, during their respective periods of involvement with the Facility, conspired in knowingly making, using, or causing to be made or used, false records or statements material to false and/or fraudulent claims.

189.    The United States has suffered substantial damages because of Defendants' conspiracies.

4.    <u>Reverse False Claims (Violation of 31 U.S.C. § 3729(a)(1)(G)).</u>

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

190.   Defendants schemed to falsely and/or fraudulently submit claims for reimbursement (i.e. for payment or approval) to the United States and falsely and/or fraudulently represent that they would comply with the Clean Water Act, their contracts with the Air Force Academy, and the NPDES permit as a condition of receiving funding from the Government.

191.   As a result of Defendants' misconduct, the Government has been falsely and/or fraudulently overcharged for Defendants' services. Throughout this scheme, Defendants have knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease and obligation to pay money to the Government. These false statements or records include but are not limited to false certifications or representations made or caused to be made by Defendants to the Government in requesting payment from the Government for Defendants' services.

192.   By creating and carrying out their fraud and by retaining Government funds, Defendants knowingly and repeatedly violated Section 3729(a)(1)(G) of the False Claims Act. Defendants' knowing concealment or knowing and improper avoidance of an obligation to pay or transmit money to the Government was a foreseeable factor in the Government's loss and a consequence of Defendants' fraud.

193.   By virtue of the Defendants' failure to disclose their obligation to repay the Government in violation of current 31 U.S.C. § 3729(a)(1)(G), the United States has suffered substantial monetary damages.

C.      Defendants' Retaliation Against Relator

194.   Section 3730(h) of Title 31 of the U.S. Code defines whistleblower protection under the FCA as follows:

> (1) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of efforts to stop 1 or more violations of this subchapter. . . .

(2) Relief … shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

195.     As discussed *supra*, Defendants retaliated against Relator because of her efforts to stop them from defrauding the Government in violation of the False Claims Act.

196.     Relator has suffered economic loss and sustained special damages because of Defendants' retaliatory acts and is entitled to relief pursuant to 31 U.S.C. § 3730(h).

## XII.     CAUSES OF ACTION

### A.  COUNT I – FALSE CLAIMS – 31 U.S.C. § 3729(a)(1)(A)

197.     Relator seeks relief against Defendants under section 37299 (a)(1)(A) of the False Claims act.

198.     As set forth above, during the relevant time period, Defendants violated the NPDES permit, which requires Defendants to comply with the NPDES permit in accordance with Clean Water Act when treating sewage.

199.     Defendants knowingly and recklessly made numerous express false certifications of compliance with the NPDES Permit and the Clean Water Act. Defendants had neither complied with the Permit, the Act, or the implementing regulations. The Facility was releasing partially treated sewage into Monument Creek and the land near the Facility and Air Force Academy. Every month since at least 2014, Defendants submitted reports to the EPA, claiming that they were in

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

compliance. Moreover, Defendants failed to self-report their violations of discharge effluent limitations as required by the NPDES permit.

200.    By virtue of the false and/or fraudulent claims that Defendants Kira, Ch2M Hill, and Aleut knowingly presented or caused to be presented, the United States Government has suffered substantial monetary damages.

B.   COUNT II – FALSE RECORDS OR STATEMENTS – 31 U.S.C. § 3729(a)(1)(B)

201.    Relator seeks relief against Defendants under Section 3729(a)(l)(B) of the False Claims Act.

202.    As set forth above, Defendants knowingly made and/or used or caused to be made and/or used false records and/or statements material to the Government's decision to pay Defendants and extend its contract to operate the Facility. Defendants made and/or used or caused to be made and/or used false records and/or statements with the specific intent to cause false and/or fraudulent claims to be paid or approved by the Government and induce the Government into extending its contract(s) with Defendants. Defendants' false statements and/or records include, but are not limited to, representations that (1) Defendants would comply with the NPDES permit requirements that sewage treated at the Facility would stay within certain discharge effluent limits and (2) Defendants would comply with the NPDES permit requirement that Defendants would self-report any event of noncompliance within twenty-four (24) hours. By virtue of the false records and/or statements that Defendants made and/or used or caused to be made and/or used, the United States Government has suffered substantial monetary damages.

C.   COUNT III – CONSPIRACY VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)

203.    Relator seeks relief against Defendants under Section 31 U.S.C. § 3729 (a)(1)(C) of the false claims act.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

204.    As set forth above, during the relevant time period, by planning and implementing their schemes, Defendants violated 31 U.S.C. § 3729(a)(1)(C).  Defendants conspired together to cause the submission of false and/or fraudulent claims, make or cause false records, and falsely represent their compliance with applicable laws and regulations, the Facility's NPDES permit, and the PWS.

205.    Until their contract ended in October of 2014, Defendants CH2M Hill and Kira, LLC, by working together as a joint venture, conspired to violate the FCA when they managed the Facility.

206.    Defendants Aleut, Tlingit Haida, and Kira, LLC conspired together to violate the FCA during their tenure as contractors and subcontractors responsible for managing the Facility. This is clear from internal investigative documents bearing Aleut's logo and Relator's interactions with personnel from all three companies.

207.    Similarly, Defendants Kira Training Services and PAE have conspired together since March of 2019 to violate the FCA.

208.    Defendants conspired to falsely certify the truth and accuracy of records submitted to the United States, including Discharge Monitoring Reports, AF-1462 forms, and NPDES permit renewal applications.  Defendants also conspired to falsely certify compliance with laws and regulations under the contracts and PWS at issue.

209.    All Defendants, during their respective periods of involvement with the Facility, conspired in knowingly making, using, or causing to be made or used, false records or statements material to false and/or fraudulent claims.

210.    The United States has suffered substantial monetary damages because of the conspiracies.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

D. <u>COUNT IV – REVERSE FALSE CLAIMS – 31 U.S.C. (a)(1)(G)</u>

211.    Relator alleges and incorporate by reference each and every allegation contained in all paragraphs of this Complaint. Relator seeks relief against Defendants under Section 3729(a)(l)(G) of the False Claims Act.

212.    Defendants schemed to falsely and/or fraudulently submit claims for reimbursement (i.e. for payment or approval) to the United States and falsely and/or fraudulently represent that it would comply with the Clean Water Act, its contracts with the Air Force Academy, and the NPDES permit as a condition of receiving funding from the Government. As a result of Defendants' misconduct, the Government has been falsely and/or fraudulently overcharged for Defendants' services. Throughout this scheme, Defendants have knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease and obligation to pay money to the Government. These false statements or records include but are not limited to false certifications or representations made or caused to be made by Defendants to the Government in requesting payment from the Government for Defendants' services.

213.    By creating and carrying out its fraud and by retaining Government funds, Defendants knowingly and repeatedly violated Section 3729(a)(1)(G) of the False Claims Act. Defendants' knowing concealment or knowing and improper avoidance of an obligation to pay or transmit money to the Government was a foreseeable factor in the Government loss and a consequence of Defendants' fraud.

214.    By virtue of the Defendants' failure to disclose their obligation to repay the Government in violation of current 31 U.S.C. § 3729(a)(1)(G), the United States has suffered substantial monetary damages.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

XIII.    INDEX OF EXHIBITS

| Exhibit No.: | Bates No.: |
|---|---|
| 1 | SMITH0007242 |
| 2 | SMITH0007279 |
| 3 | SMITH0007302 |
| 4 | SMITH0007303 |
| 5 | SMITH0007307 |
| 6 | SMITH-0006886 |
| 7 | SMITH-0003548 |
| 8 | SMITH-0005289 |
| 9 | SMITH-0002410 |
| 10 | SMITH-0001879 |
| 11 | SMITH-0002084 |
| 12 | SMITH-0005376 |
| 13 | SMITH-0005374 |
| 14 | SMITH-0005075 |
| 15 | SMITH-0005086 |

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

| 16 | SMITH-0005113 |
|----|---------------|
| 17 | SMITH-0003479 |
| 18 | SMITH-0003268 |
| 19 | SMITH-0006084 |
| 20 | SMITH-0005815 |
| 21 | SMITH-0005989 |
| 22 | SMITH-0004808 |
| 23 | SMITH-0004768 |
| 24 | SMITH-0003758 |
| 25 | SMITH-0003766 |
| 26 | SMITH0002032 |
| 27 | SMITH-0003189 |
| 28 | SMITH-0003168 |
| 29 | SMITH-0003174 |
| 30 | SMITH-0003182 |
| 31 | SMITH-0001672 |

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

| | |
|---|---|
| 32 | SMITH-0003185 |
| 33 | SMITH-0003184 |
| 34 | SMITH-0003172 |
| 35 | SMITH-0003178 |
| 36 | SMITH-0003175 |
| 37 | SMITH-0003177 |
| 38 | SMITH-0004441 |
| 39 | SMITH-0002925 |
| 40 | SMITH-0006049 |
| 41 | SMITH-0007199 |
| 42 | SMITH-0003776 |
| 43 | SMITH-0003780 |
| 44 | SMITH-0006282 |
| 45 | SMITH-0006283 |
| 46 | SMITH-0002584 |
| 47 | SMITH-0003720 |

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

| 48 | SMITH-0002429 |
|----|---------------|
| 49 | SMITH-0003642 |
| 50 | SMITH-0003511 |
| 51 | SMITH0002416 |
| 52 | SMITH-0002575 |
| 53 | SMITH-0002902 |
| 54 | SMITH-0000115 |
| 55 | SMITH-0007219 |
| 56 | SMITH-0007188 |
| 57 | SMITH-0007214 |
| 58 | SMITH-0002456 |
| 59 | SMITH-0003266 |
| 60 | SMITH-0006825 |
| 61 | SMITH-0001701 |

## IX.   DEMAND FOR JURY TRIAL

215.   Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

## X.   RELIEF

216.   On behalf of the United States Government, Relator seeks to recover monetary damages equal to three times that suffered by the Government. In addition, Relator seeks to recover all civil penalties on behalf of the Government in accordance with the False Claims Act.

217.   Relator seeks an award totaling the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

218.   Relator seeks an award for all costs and expenses for this action, including attorneys' fees and court costs.

219.   Relator seeks pre-judgement at the highest rate allowed by law

## XI.   PRAYER

220.   WHEREFORE, relator pray for judgement in his favors and against defendant for the following:

- Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of the Defendant's conduct;

- Civil penalties against Defendant equal to $21,563 for each violation of 31 U.S.C. § 3729;

- The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

- All costs and expenses of this litigation, including attorneys' fees and costs of court;

- Relator's individual damages;

- Pre-judgment interest at the highest rate allowed by law; and

- All other relief on Relator's behalf or on behalf of the United States Government to which it may be entitled and that the Court deems just and proper.

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

Respectfully submitted,

 BERG & ANDROPHY

*/s/ Joel M. Androphy*
Joel M. Androphy
D.C. Bar No. 999769
Caroline Gorman
(admission *pro hac vice* forthcoming)
TX State Bar No. 24109939
1300 I Street NW, Suite 400E
Washington, DC 20005
Telephone (713) 529-5622
Facsimile (713) 529-3785
jandrophy@bafirm.com
cgorman@bafirm.com

COUNSEL FOR RELATOR BRENDA SMITH

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2022, a true and correct copy of this complaint was delivered to the United States Attorney's Offices for the District of Columbia and the Department of Justice in Washington, D.C. via electronic mail and via the United States Mail, certified, return receipt requested.


<u>/s/ Caroline K. Gorman</u>